## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

Amy M. Wery,                                    )
                                                )
                Plaintiff,                      )
                                                )
        vs.                                     )
                                                )       Case No.  1:11-cv-23
NDDOCR, DWCRC, SWMCC, Colby                     )
Braun, LeeAnn Bertsch, Jo Rooks, Heather        )
Luchi, Sean Bowen, Gary Morel, Jessie           )       **REPORT AND**
Hauschild, Don Hanel, Theresa Wunderluch,)               **RECOMMENDATION**
DeeAnn Marsch, Sandra Sund, Angie               )
Wanzek, Barb McGillivary, and Terry             )
Enzminger, all in their individual and          )
official capacities,                            )
                                                )
                Defendants.                     )

        Plaintiff Amy M. Wery ("Wery"), who is proceeding *pro se* and *in forma pauperis*, filed

an amended complaint pursuant to 42 U.S.C. § 1983.  (Doc. #20).  Upon initial review of the

amended complaint, the court ordered service upon the defendants.  (Doc. #25).  Defendants

DWCRC, SWMCC, Sean Bowen, Colby Braun, Don Hanel, Jessie Hauschild, Heather Luchi,

DeeAnn Marsch, Gary Morel, Jo Rooks, Sandra Sund and Angie Wanek (hereinafter referred to

collectively as "County Defendants") filed a motion to dismiss, or in the alternative, for

summary judgment.[1]  (Doc. #50).  Theresa Wunderluch was also one of the County Defendants,

but Wery moved to voluntarily dismiss the action as to her (Doc. #56), and Wery's motion was

granted by the court (Doc. #94).  Additionally, defendants NDDOCR, LeeAnn Bertsch, Terry

Enzminger and Barb McGillivary (hereinafter referred to collectively as "State Defendants")

---

[1]  DWCRC refers to the Dakota Women's Correctional Rehab Center, SWMCC refers to
the Southwest Multi-County Corrections Center, and Jessie Hauschild is now known as Jessie
Sticka.

filed a motion for summary judgment.[2]  (Doc. #77).  The motions have been briefed, the court

gave Wery notice that it intended to convert the County Defendants' motion to dismiss into a

motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and

the court allowed Wery an opportunity to supplement her response to the County Defendants'

motion with appropriate evidentiary materials.[3]  (Doc. #105).  However, the court's order

allowing Wery to supplement her response was returned as undeliverable to both addresses Wery

had submitted to the court during the course of this action.  (Doc. #107, Doc. #108).  Wery failed

to inform the court of an updated address until today, after the deadline to supplement her

response.

## Claims

Wery alleges in her amended complaint claims of deliberate indifference to her serious

medical needs, excessive force, invasion of privacy, harassment or retaliation, denial of access to

the courts, and interference with legal mail.  Additionally, Wery was granted leave to

supplement her amended complaint, and in the supplement she raised additional privacy issues

including those related to the Health Insurance Portability and Accountability Act ("HIPAA").

Wery seeks $100,000 in compensatory and punitive damages for each alleged violation of her

constitutional rights.

---

[2]  NDDOCR refers to the North Dakota Department of Corrections and Rehabilitation, the correct spelling of LeeAnn Bertsch's name is Leann Bertsch, and Terry Enzminger's actual name is Terry Eslinger.

[3]  The court allowed Wery 45 days after service of the order to supplement her response. (Doc. #105).  The court, noting it had been very generous with granting Wery extensions in this matter, ordered that no more extensions would be afforded to the parties as this matter had been pending for quite some time.  Id.

## Summary of Recommendation

As a matter of law, Wery is not entitled to relief from the defendants. It is

**RECOMMENDED** that the County Defendants' motion for summary judgment (Doc. #50) be

**GRANTED**, the State Defendants' motion for summary judgment (Doc. #77) be **GRANTED**,

the County Defendants' motion to dismiss (Doc. #50) be found as **MOOT**, and Wery's amended

complaint (Doc. #20) be **DISMISSED** with prejudice.

## Summary Judgment Standard

Summary judgment is appropriate if there is not a genuine issue of material fact and the

moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); Celotex Corp. v.

Catrett, 477 U.S. 317, 322-23 (1986). Rule 56 of the Federal Rules of Civil Procedure

"mandates the entry of summary judgment . . . against a party failing to make a showing

sufficient to establish the existence of an element essential to that party's case." Celotex, 477

U.S. at 322. The burden is on the moving party to establish the basis for its motion. Donovan v.

Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). If the moving party has

supported its motion for summary judgment, the nonmoving party has an affirmative burden

placed on it to go beyond the pleadings and show a genuine triable issue of fact. Commercial

Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir. 1992). The court views the facts in the

light most favorable to the nonmoving party, who enjoys "the benefit of all reasonable inferences

to be drawn from the facts." Vacca v. Viacom Broadcasting of Missouri, Inc., 875 F.2d 1337,

1339 (8th Cir. 1989) (citation omitted).

## Deliberate Indifference to Serious Medical Needs

Wery contends she was denied needed medical treatment by staff for a period of

approximately five months. Specifically, Wery alleges that in August of 2008, she began suffering from gallstone attacks. (Doc. #20, p. 2). At that time she was put on a low fat diet and was given hot packs. Id. In late September of 2008, Wery states she again began suffering from gallstone attacks, which caused nausea and the vomiting of blood. Id. In November of 2008, Wery was placed in the infirmary for two days for observation. Id. at 3. While in the infirmary, Wery had an altercation with prison staff regarding whether there was blood in her vomit, and at that time she states she was offered pain medication, but was unable to take the medication due to her vomiting. Id. Wery claims she wrote to Dr. Hostetter, a physician at the Department of Corrections, requesting that he intervene. Id. Wery states she had been complaining of gallbladder pain and had been requesting an ultrasound for three months. Eventually, Wery had an ultrasound that confirmed she had gallstones.[4] Id. at 4.

Wery alleges defendant Sandra Sund ("Sund"), who was employed as a part-time nurse at the DWCRC, and defendant DeeAnn Marsch ("Marsch"), who was the Medical Services Director for DWCRC, lied by saying there was no blood in Wery's vomit, knew Wery was having gallbladder attacks, failed to timely order an ultrasound, failed to refer Wery to a doctor even though she had been vomiting for months, and lied about the number of gallstones discovered by the ultrasound. Id. at 4-5. Wery states the actions of Sund and Marsch placed her in severe pain and could have caused the blockage of a bile duct resulting in Wery's death. Id. at 5.

---

[4] Wery's ultrasound was on December 29, 2008. (Doc. #52-1, p. 14).

Wery filed a complaint against Sund with the North Dakota Board of Nursing.[5] (Doc. #52-1, pp. 1-3). In response to the complaint, defendant Sund provided a time line of events. The time line does not begin until October 25, 2008, about two months after Wery alleges she began suffering from gallstone attacks. Id. at 11. According to the time line, on October 25, 2008, Wery complained of pain between her shoulder blades. Id. This is consistent with Wery's complaint to the North Dakota Board of Nursing. In her complaint Wery challenged the care provided to her beginning in approximately September or October of 2008, at which time Wery said she presented with serious pain underneath her right shoulder blade. Id. at 1-2. The time line indicates Wery was given a hot pack and biofreeze treatments. Id. at 11.

On November 4, 2008, the time line reflects that Wery again complained of pain between her shoulder blades, and she stated she was concerned she had Barrett's esophagus.[6] Id. Wery was diagnosed with possible gastroesophageal reflux disease ("GERD") and was prescribed Prevacid. Id. On November 12, 2008, Wery complained of upper back pain, she was diagnosed with possible upper back spasms, and was prescribed Flexeril. Id.

On November 14, 2008, the time line indicates Wery complained of nausea along with chest pain. Id. at 12. Wery also stated she vomited, but it was noted in the time line that the vomiting was not witnessed. Id. Wery was admitted to the infirmary for observation, and was released the next morning as she was feeling better. Id. While in the infirmary Wery's vital

---

[5] Wery's complaint against Sund filed with the North Dakota Board of Nursing was dismissed because there was insufficient evidence to support a violation of the law. (Doc. #52-2).

[6] Barrett's esophagus is a condition in which the cells of the lower esophagus become damaged, and it is generally a complication of gastroesophageal reflux disease ("GERD"). http://www.mayoclinic.com/health/barretts-esophagus/HQ00312.

signs were monitored and she was given an EKG, which came back normal. Id. The time line reflects defendant Sund followed up with Wery on November 19, 2008, and Sund noted Wery was back to work and doing much better. Id.

On November 20, 2008, Wery complained of upper back and chest pain. Id. Wery refused muscle relaxers and nonsteroidal anti-inflammatory drugs for pain. Id. The time line reflects that two days later, Wery was admitted to the Segregation or Special Management Unit ("SMU") for behavior problems. Id. Wery had written a note to the Medical Department stating she had a lump on her arm, but she refused a nursing assessment, would not answer the nurse's questions regarding the lump, yelled at the nurse, and left the infirmary. Id.

On November 24, 2008, Wery complained of generalized muscle pain. Id. Blood tests were performed and came back normal. Id. On December 1, 2008, Wery presented with abdominal pain. Id. A test was ordered to check for a bacterial infection in Wery's stomach. Id.

On December 3, 2008, Wery again complained of abdominal pain along with right shoulder pain and blood in her vomit. Id. Wery was admitted to the infirmary for observation. Id. This is when the altercation occurred between Wery and prison staff over whether there was blood in her vomit. Id. at 12-13; see also (Doc. #52-3) (incident report filed by defendant DeeAnn Marsch charging Wery with disorderly conduct for yelling at a nurse and defendant Sund, and for smearing blood and waste on a cell window). The time line reflects that Wery had a "very small amount of blood tinged sputum," but there was no vomiting. Id. at 13. Wery was advised to notify the nurse if she vomited or passed stool so it could be checked for blood. Id. It is noted that prior to Wery being placed in the infirmary, there was a conflict resolution meeting to address Wery's medical complaints. Id. Wery stated during the meeting she thought the pain

was either from her gallbladder or her spine.  Id.  Wery had also stated she vomited most of the night, but no prison staff witnessed the vomiting.  Id.

On December 4, 2008, the time line indicates Wery slept in the infirmary without complaints of abdominal pain or nausea, nurses checked on Wery every half hour to an hour, and Wery stated she vomited, but she failed to alert the nurse.  Id. The next day Wery was discharged from the infirmary.  Id.

On December 11, 2008, a comprehensive metabolic blood test ("CMP") and an ultrasound were ordered.  Id.  Wery was informed that the CMP test came back normal.  Id.  She was also informed that the test previously run to check for a bacterial infection in her stomach came back normal as well.  Id.

The time line reflects that on December 12, 2008, a nurse noticed approximately four cubic centimeters of blood in the toilet while Wery was in the SMU.  Id.  Wery was housed in the SMU for five days.  Id.  During that time it was noted that Wery's appetite was fine and she was drinking fluids without problems.  Id.  Wery did not complain of vomiting, and vomiting was not observed by staff.  Id.

On December 17, 2008, Wery presented with right shoulder pain and pain in her rib cage. Id. at 14.  There were "[s]mall streaks of blood in her sputum."  Id.  Defendant Sund told Wery she was going to order an ultrasound of Wery's gallbladder along with a scope procedure to look at Wery's esophagus.  Id.  Defendant Sund called and spoke with Dr. Hostetter, who ordered an endoscopy.  Id.  That same day Wery reported she had hives from Prilosec.  Id.  The Prilosec was discontinued and Wery was given Benadryl.  Id.

On December 19, 2008, Wery complained of nausea and reported that she vomited blood. Id.  However, the vomiting was not witnessed by prison staff.  Id.  Wery stated that her appetite

was good and requested she be placed on Prevacid for her stomach problems as the Prilosec caused her hives.  Id.  Wery was prescribed Prevacid.  Id.

The time line reflects Wery reported having a seizure on December 28, 2008.  Id.  No one witnessed the seizure.  Id.  Wery was placed in the infirmary for two days for observation.  Id.  The next day Wery told defendant Sund that she did not remember anything, but did not "feel like [she] had a seizure."  Id.  Sandra Sund performed an assessment with negative findings.  Id.  Sund noted that Wery stated her stomach was much better since starting Prevacid, but "she just did not feel good."  Id.

On December 29, 2008, Wery had the ultrasound of her gallbladder.  Id.  On January 7, 2009, Defendant Sund noted that she told Wery she had some gallstones, but Wery thought Sund had said she had only one gallstone.  Id.  An appointment for a surgical consult was scheduled.  Id.  Sandra Sund spoke with Dr. Hostetter and he directed Sund to schedule a cholecystectomy, if it was recommended by the surgeon.  Id.  Wery was informed of the plan and agreed, and her endoscopy was cancelled.  Id.  On January 15, 2009, Wery was diagnosed with cholelithiasis and the surgeon recommended a cholecystectomy.  Id. at 15.

On January 17, 2009, Wery was admitted to the infirmary with complaints of nausea, vomiting, and severe pain in her abdomen.  Id.  She was prescribed Phenergan for her nausea, which she refused, and Hydrocodone.  Id.  The time line reflects that defendant Sund consulted with a doctor who agreed with the medication orders.  Id.

On January 18, 2009, Sund ordered that Wery be given nothing except water due to nausea.  Id.  The nurse on duty did not report any vomiting.  Id.  The time line indicates that Wery was angry and told the nurse she should be in the emergency room on intravenous fluids

and pain medication.  Id.  Sund had a conference call with defendant Marsch and Dr. Hotstetter, who ordered that Wery's gallbladder disease and self-reported dehydration be monitored with daily urinalysis and lab work.  Id.  Dr. Hotstetter did not feel Wery needed to be in the infirmary.  Id.  An assessment was performed, indicating among other negative findings no dehydration, no vomiting or diarrhea, and a non-tender abdomen.  Id.  Wery was discharged from the infirmary and was instructed to report to the staff if any of her symptoms reoccurred.  Id.  The time line reflects that Wery yelled at Sund regarding her treatment.  Id.  While Wery was in the infirmary, Sund noted Wery was pacing with no obvious signs of pain.  Id.  In the following days all urinalysis and blood tests came back normal.  Id. at 15-16.

Wery's gallbladder was removed on January 26, 2009.  Id. at 16.  The following day she was released from the hospital and was admitted to the infirmary for observation.  Id.  On January 28, 2009, Wery was discharged from the infirmary following a negative assessment.  Id.  In the weeks following Wery's operation, Wery's nursing assessments noted no issues regarding the surgery.  Id.  According to Sund, Wery's care was reviewed by a collaborating physician and the NDDOCR physician was consulted.  Id. at 18.

Prisoners find protection in the Eighth Amendment against prison officials' "deliberate indifference" to their "serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106 (1976).  "A prison official is deliberately indifferent if she 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health or safety."  Nelson v. Corr. Med. Services, 583 F.3d 522, 528 (8th Cir. 2009) (quoting Farmer v. Brennen, 511 U.S. 825, 827 (1994).

A prisoner claiming an Eighth Amendment violation is required to prove both an objective and subjective element.  Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004).  The

defendant's conduct must objectively rise to the level of a constitutional violation by depriving a prisoner of the "minimal civilized measure of life's necessities." Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 342 (1981)). It must also reflect a subjective state of mind evincing deliberate indifference to a prisoner's health or safety. Id. (citing Estelle, 429 U.S. at 104).

A prisoner establishes deliberate indifference by showing the defendant was substantially aware of, but disregarded an excessive risk to her health or safety. Id. "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir.1995). Medical malpractice alone is not actionable under the Eighth Amendment. Smith v. Clarke, 458 F.3d 720, 724 (citing Estelle, 429 U.S. at 106).

"When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should . . . be measured by reference to the *effect* of delay in treatment." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (citation and internal quotation marks omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." Id. (citation and internal quotation marks omitted).

Wery cannot show the defendants violated her constitutional rights by being deliberately indifferent to her serious medical needs. The record demonstrates Wery was under constant supervision of nursing personnel who consistently evaluated Wery's condition. There is no evidence nursing personnel deliberately disregarded Wery's needs by administering inadequate treatment. Wery has failed to establish the subjective prong of her claim.

Defendants did not lie about there being blood in Wery's vomit or sputum. Defendant Sund's time line reflects notations that Wery had some blood in her sputum, and a small amount

of blood was observed in the toilet. (Doc. #52-1, pp. 13-14). Despite Wery's symptoms, defendants Sund and Marsch could not have known Wery had gallstones prior to her ultrasound. A misunderstanding or a miscommunication may have occurred about the number of gallstones Wery had, but that does not demonstrate the defendants were deliberately indifferent to Wery's medical needs. Additionally, Wery's assertion that a bile duct could have been blocked resulting in her death does not support her claim, as the consequence did not occur. Ultimately, Wery's gallbladder was removed and she recovered.

In regard to Wery's symptoms, she was given hot packs, biofreeze treatments, and medications for pain and nausea. Wery was regularly monitored in the infirmary and given numerous tests including an EKG, blood tests, urinalysis tests, and a test to check for a bacterial infection in Wery's stomach. An endoscopy was ordered in an effort to determine what was causing Wery's ailments, however, it was not performed because the ultrasound discovered the source of Wery's issues. Although Wery would have preferred to have had an ultrasound earlier, her disagreement with the course of treatment provided does not rise to the level of a constitutional violation.

### Excessive Force

Wery alleges defendants Jessie Hauschild ("Hauschild") and Angie Wanzek ("Wanzek"), corrections officers at DWCRC, used excessive force. On November 22, 2008, Wery states she and Hauschild had an argument after Wery requested a grievance form, and Hauschild "slammed [Wery] into the wall." (Doc. #20, p. 6). She was then handcuffed and escorted to the SMU. Id. Wery states that while she was being escorted Hauschild squeezed her arm to the point of leaving four fingerprint bruises. Id. at 7. Wery says she requested Hauschild to let go of her arm

and informed her that it hurt, but Hauschild "squeezed tighter."  Id.  Additionally, Wery alleges

on another occasion Hauschild kicked Wery's bed and yelled at her to "get up to go to work."

Id. at 8.

Wery filed a grievance form on November 23, 2008 regarding the incident.  (Doc. #52-3,

pp. 4-6, 28-31; Doc #78-3, pp. 2-7).  A nursing assessment performed on Wery on November 24,

2008, confirmed Wery had five small bruises on her inner upper right arm.  (Doc. #52-3, p. 11).

At some point a photo was taken of Wery's arm, however, the photo was deleted from a digital

camera.  (Doc. #52-4, pp. 1-5, 8; Doc. #78-14, pp. 1-2).  The court accepts as established fact for

purposes of the pending motions that Wery had bruises on her arm.

On November 24, 2008, Hauschild filed a use of force report.  (Doc. #52-3, pp. 9-10;

Doc. #78-4, pp. 6-7).  In Hauschild's report she states she was asked by a nurse to be present at

Wery's medical assessment.  Id.  Hauschild contends that at the assessment Wery was

argumentative, and afterwards she became "disorderly and belligerent."  Id.  Hauschild says she

directed Wery to go to her dorm and she called Correctional Officer Zane Perry to assist.  Id.

Hauschild states Wery was shouting in the lobby, and returned to the office screaming at

Hauschild.  Id.  Hauschild says she directed Wery to stop yelling, and when Wery did not

comply she ordered Wery to stand up and put her hands on the wall so she could be handcuffed

and escorted to the SMU.  Id.  She states that Wery did not comply, so Hauschild "took hold of

[Wery's] upper right arm."  Id.  Hauschild contends that Wery began to resist so Hauschild

tightened her grip and firmly assisted Wery to her feet.[7]  (Doc. #52-3, p. 10; Doc. #78-4, p. 7).

_____

[7] Wery contends Hauschild did not pull her out of the chair.  Rather, she states she stood
up on her own.  (Doc. #55, p. 1).  Additionally, Wery states a witness report, which was withheld
by the defendants, corroborates that she stood up on her own.  Id.

Once Wery was on her feet Hauschild says she pulled Wery in front of her to put Wery up against the wall. Id. Hauschild states that Wery continued to resist so Hauschild "[p]ushed her up against the wall with a firm amount of force, grabbed her right hand and brought it behind her back and applied [the] cuff." Id. Hauschild contends she then escorted Wery to the SMU, and during the escort Wery tried walking fast so Hauschild maintained a firm hold on Wery's upper arm. Id.

On November 25, 2008, Hauschild filed an incident report charging Wery with disorderly conduct. (Doc. #52-3, pp. 14-15; Doc. #78-4, pp. 11-12). A disciplinary investigation revealed that Correctional Officer Zane Perry could hear Wery screaming while he was on the phone with Hauschild and he stated that Wery was "out of control." (Doc. #52-3, p. 17; Doc. #78-4, p. 14). Wanzek's report regarding what occurred in the office corroborates Hauschild's report, and Zane Perry's report regarding what occurred during Wery's escort indicates that Wery continued to yell at Hauschild. (Doc. #52-3, pp. 19-23; Doc. #78-4, pp. 16-20). In regard to the incident report, Wery stated she thought both she and Hauschild "were in the wrong." (Doc. #52-3, p. 4; Doc. #78-4, p. 11). Wery was found to have committed the prohibited act of disorderly conduct. (Doc. #52-3, p. 16; Doc. #78-4, p. 13).

On December 5, 2008, defendant Sean Bowen ("Bowen"), who was the Chief of Security at DWCRC, filed an investigative report regarding the use of force by Hauschild. (Doc. #52-3, pp. 7-8; Doc. #78-4, pp. 4-5). Bowen found Wery had been yelling and being disruptive in the hall, Wery failed to comply with Hauschild's requests to return to her dorm and stop yelling, Wery refused to stand up when ordered, Wery resisted being placed in handcuffs and attempted to pull away from Hauschild, and while being escorted to the SMU Wery attempted to walk

ahead of the officers, requiring Hauschild to maintain a firm grip on Wery's upper arm.  Id.
Bowen also found that force was needed to control the situation and the force applied was in
good faith.  Id.  Wery denies resisting being placed in handcuffs and states she had packed her
belongings knowing she would be placed in the SMU.  (Doc. #78-1, p. 3; Doc. #96, p. 7).
Defendant Leann Bertsch, director of the NDDOCR, agreed with the investigative findings and
denied Wery's grievance.  (Doc. #78-5, pp. 1-2; Doc. #78-9, p. 1).

The Eighth Amendment protects inmates from the unnecessary and wanton infliction of
pain by correctional officers, regardless of whether an inmate suffers serious injury as a result.
Johnson v. Blauket, 453 F.3d 1108, 1112 (8th Cir. 2006).  Officers are permitted to use force
reasonably "in a good-faith effort to maintain or restore discipline," but force is not to be used
"maliciously and sadistically to cause harm."  Id.  Factors to be considered in deciding whether a
particular use of force was reasonable are "whether there was an objective need for force, the
relationship between any such need and the amount of force used, the threat reasonably
perceived by the correctional officers, any efforts by the officers to temper the severity of their
forceful response, and the extent of the inmate's injury."  Id. (quoting Treats v. Morgan, 308
F.3d 868, 872 (8th Cir. 2002)).  This is not to say, however, that every push or shove that is later
proven to be unnecessary constitutes a constitutional violation.  Hudson v. McMillian, 503 U.S.
1, 9 (1992).  A de minimus use of force that is not "repugnant to the conscience of mankind"
does not constitute cruel and unusual punishment, even if malicious.  Id. at 9-10 (citations
omitted).

Wery essentially admitted she was being disorderly by stating she was in the wrong when
charged by incident report with the infraction of disorderly conduct.  (Doc. #52-3, p. 4; Doc.

#78-4, p. 11).  While Wery does not admit she was walking too fast, which prompted Hauschild to squeeze Wery's upper arm, she does not deny it either.  Rather, Wery says that even if she was walking too fast no one requested her to slow down.  (Doc. #55, p. 5).  Wery was disorderly and Hauschild used a minimal amount of force in placing Wery in handcuffs and escorting her to the SMU.  Hauschild appears to have used force to maintain or restore discipline, and her use of force is not repugnant to the conscience of mankind.  Additionally, there is no allegation that defendant Angie Wanzek used any force.  Finally, Wery's allegation that Hauschild kicked her bed and yelled at her to wake her up does not constitute excessive force.  Although there are probably better ways to awaken someone, Hauschild's actions were not repugnant to the conscious of mankind and do not appear to be malicious.  Wery cannot prevail on her claim for excessive force as a matter of law.

### Invasion of Privacy

Wery contends she was denied her right to privacy on three occasions.  She states that in February of 2005, while in the infirmary for three days, Wery was viewed on a security camera by male officers while she was using the toilet, showering and changing clothes.[8]  (Doc. #20, pp. 9, 12).  On November 22, 2008, Wery alleges that after Hauschild and Officer Zane Perry escorted her to the SMU, Hauschild told Wery that if she did not submit to a strip search Hauschild would "assemble a team and . . . cut [Wery's] clothes off . . . by force."  Id. at 10.  Wery ultimately submitted to the strip search and contends male officers in the control room

---

[8] Wery refers to being taped and viewed in cell A-28, which is where the infirmary is located.

viewed the search on a security camera.[9]  Id. at 11.  Finally, on January 30, 2012 and on January 31, 2012, Wery alleges that while in the infirmary she was viewed on a security camera by male officers in the control room while she was using the toilet, washing herself and changing clothes. (Doc. #55, p. 2; Doc. #75, p. 1; Doc. # 96, p. 8).

I.      2005 Incident

In 2005 while Wery was in the infirmary the security camera "had some visibility in the shower area."  (Doc. #52-3, p. 33; Doc. #78-4, p. 30).  After Wery filed a grievance form the correctional facility corrected the issue.  Id.  The facility was unaware that the cameras in the infirmary "had some visibility in the shower area" prior to Wery filing her grievance.  Id.

The County Defendants contend Wery's claim regarding the 2005 incident is barred by the statute of limitations.  "The applicable state law statute of limitations governs § 1983 claims."  Baker v. Chisom, 501 F.3d 920, 922 (8th Cir. 2007) (citing Board of Regents v. Tomanio, 446 U.S. 478, 484 (1980)).  North Dakota's six-year statute of limitations applies to § 1983 actions.  Carpenter v. Williams County, North Dakota, 618 F.Supp 1293 (D.N.D. 1985).  However, North Dakota has a tolling statute that extends the period of limitations for up to five years for prisoners serving less than a life term.  See N. D. Cent. Code § 28-01-25 (1973).  It is unclear whether Wery's claim regarding the 2005 incident is time-barred, but in any event, the claim does not rise to the level of a constitutional violation.

---

[9]  Wery initially refused to allow Hauschild to complete the strip search.  (Doc. #52-3, pp. 2, 23).  The correctional facility protocol is that when an inmate refuses to complete the search, staff is to form a "Forced Cell Extraction Team" to ensure that the strip search is performed safely.  Id.  This could result in cutting off an inmate's clothes.  Id.  After Hauschild told Wery her clothes may be cut off, Wery complied with the strip search.  Id.

The Eighth Circuit has held that opposite-sex surveillance performed on the same basis as same-sex surveillance is not unreasonable where justified by safety and equal employment concerns. Timm v. Gunter, 917 F.2d 1093, 1102 (8th Cir. 1990). "Whatever minimal intrusions on an inmate's privacy may result from such surveillance, whether the inmate is using the bathroom, showering, or sleeping in the nude, are outweighed by institutional concerns for safety and equal employment opportunities." Id. (citation omitted).

In this case it is not clear whether male officers were in the control room while Wery was showering, changing clothes or using the toilet, or whether they were able to view Wery in stages of undress on the surveillance camera. Assuming males did view Wery nude or partially-nude, it is evident that the viewing was nothing more than accidental as the facility was not even aware that the camera had some visibility in the showering area. Additionally, the surveillance did not occur on a regular basis as Wery was only in the infirmary for three days, and there is justification for surveillance in an infirmary to monitor an ill inmate, and for the security of nursing staff who are providing care. There are also institutional concerns regarding equal employment opportunities for males working in the control room. In regard to the 2005 incident, Wery has failed to raise a genuine issue of material fact, and defendants are entitled to judgment as a matter of law.

II.      2008 Incident

The SMU is a maximum security area and the correctional facility has a policy requiring strip searches of any inmate admitted to the SMU to ensure security and inmate safety. (Doc. #52-3, p. 1; Doc. #78-4, p. 1). Each cell in the SMU has a box where cameras can be placed, but no camera was in the unit in which the strip search of Wery occurred. (Doc. #52-3, pp. 1, 34;

Doc. #78-4, p. 31).  No correctional officers, male or female, viewed the strip search of Wery from within the control room.  Additionally, no males were present in the cell when Officer Hauschild performed the strip search of Wery.  (Doc. #52-3, p. 1; Doc. #52-3, p. 22; Doc. #78-4, p. 2; Doc. #78-5, p. 1).  In regard to the 2008 incident, Wery has failed to raise a genuine issue of material fact, and as a matter of law, she cannot prevail on this claim.

III.    2012 Incident

On January 30, 2012 and on January 31, 2012, while Wery was in the infirmary, no male correctional officers were in the control room.  (Doc. #99; Doc. #99-1).  No male officers viewed Wery undressed on the security camera.  No genuine issue of material fact exists on this claim, and defendants are entitled to dismissal of the claim as a matter of law.

**Harassment**

Wery alleges in March or April of 2009, Corrections Officer Don Hanel ("Hanel") began harassing her.  Wery was in the SMU and states that Hanel yelled at her for talking to another inmate.  (Doc. #20, p. 16).  Wery contends she told Hanel she has a right to free speech, and in response Hanel told Wery "he was taking [her] recreation away."  Id. at 17.  Wery says she requested to see the Captain and Hanel said "tough shit."  Id.  Hanel allegedly returned to Wery's cell a few minutes later, paced back and forth in front of the cell with his chest puffed out, made faces at her, told her he was "helping [her] out for [her] big-bad lawsuit," and taunted Wery despite her repeated requests for him to stop.  Id.  Wery states that the entire time Hanel was harassing her she pushed the call button for help, but another corrections officer, Theresa Wunderluch, would not respond despite being able to hear and see the harassment on the surveillance camera and over the intercom.  Id. at 18.  Eventually, the Captain arrived and Wery

18

states that Hanel admitted to his behavior.  Id. at 17-18.  The court notes that Wery moved to voluntarily dismiss the action as to Theresa Wunderluch, and that motion was granted by the court. (Doc. #55, p. 5, Doc. #56, Doc. #94).

Wery contends that Hanel continued to harass her for two months after the initial incident by making "his presence known" and by following her into the bathroom on one occasion.[10] (Doc. #20, pp. 18, 20-21).  Wery states that Hanel's behavior caused or exacerbated the symptoms of her post traumatic stress disorder, and the facility eventually provided her with counseling and relocated her as a result.  Id. at 18-19.  Additionally, Wery alleges other employees at the facility or within the NDDOC failed to protect her from Hanel's harassment. Id. at 20.

Wery filed several grievances regarding Hanel's behavior.  An investigation revealed Hanel did make inappropriate comments to Wery about filing a lawsuit, and that his supervisors addressed the issue with him.  (Doc. #52-5, p. 4; Doc. #78-10, p. 1; Doc. #78-11, p. 1; Doc. #78-13, p. 1; Doc. #78-19, p. 1; Doc. #78-21, p. 1).  The investigation also found Wery was not treated differently than other inmates.  (Doc. #52-5, 1-2, 14; Doc. #78-10, p. 1; Doc. #78-13, p. 1; Doc. #78-16, p. 1; Doc. #78-19, p. 1).

Construing Wery's amended complaint liberally and after reviewing Wery's grievances, it appears her claim may be that Hanel acted in retaliation against her for exercising her right to free speech.  (See Doc. #78-10, p. 1; Doc. #78-20, p. 5-6).  According to one of Wery's inmate grievance forms, Wery alleges the following events occurred which caused Hanel to start

---

[10]  The court notes Wery's grievances regarding Hanel's behavior do not state he followed her into the bathroom.  (Doc. #52-4, p. 11; Doc. #52-5; Doc. #78-10; Doc. #78-11; Doc. #78-12; Doc. #78-14, pp. 4-5; Doc. #78-16, p. 1, Doc. #78-17, p. 1, Doc. #78-20, pp. 3-11; Doc. #78-26, p. 2).

harassing or retaliating against Wery:  Hanel was upset with Wery for not utilizing her recreation time in earlier in the day.  (Doc. #78-10, p. 1).  Apparently, Wery had pushed the emergency call button prior to her argument with Hanel about getting recreation time, and Theresa Wunderluch responded to Wery and requested the Captain meet with Wery.  (Doc. #52-5, p. 2).  Wery told Hanel she was entitled to recreation five days a week, and she was unable to have recreation time earlier because of an issue at the facility.[11]  (Doc. #78-10, p. 1).  After their conversation involving recreation time, Wery alleges that Hanel got mad at her for talking to another inmate, and in response Wery told Hanel she has a right to free speech.  Id.  Hanel then told Wery she could only have a half hour of recreation.  Id.  Wery said, "[T]hat's bullshit, Don, and you know it."  Id.  In response Hanel told Wery she would get no recreation time that day.  Id.  Wery requested to see the Captain and asked Hanel for a grievance form, but Hanel allegedly told her he did not have to give her a form as the Captain gives out grievance forms.  Id.  Wery pushed the call button and requested to see the Captain.  Shortly thereafter Hanel threatened Wery by saying she would be written up any time she talked in the SMU.  Id.  Wery states she said, "[G]o ahead . . . I have a 1st amendment right to freedom of speech."  Id.  Hanel then made several comments to Wery  including "bring it on," "you can only sue the prison," and "I'm helping you out for your big bad lawsuit."  Id.

Wery was housed in the SMU during the incident with Hanel.  The SMU is a maximum security unit for unruly inmates.  In Wery's second grievance regarding Hanel's alleged harassment Wery admitted Hanel also went to two other inmates' cell "because that's the night

---

[11]  Wery does not state what the issue was at the facility that prevented her from having recreation time.

all hell broke loose."[12]  (Doc. #52-5, p. 2).  This indicates Wery was not treated differently than other inmates on that evening.  In a later grievance Wery alleged Hanel harassed her by not waiting for her to put her glasses on prior to turning on the lights, and by making sarcastic remarks.[13]  Id. at 14.

Wery's has failed to state an actionable claim for retaliation.  In regard to Hanel's comments and threat to write Wery up for talking, general harassment and verbal harassment are not actionable under § 1983.  McDowell v. Jones, 990 F.2d 433 (8th Cir. 1993).  Wery does not allege she was actually written up for talking, and there is no evidence in the record that she was.  Wery's statement that Hanel harassed her by making "his presence known" is too broad to support a retaliation claim.  See Flittie v. Solem, 827 F.2d 276, 281 (8th Cir. 1987) (allegations that are "simply too broad and conclusory" will not support a retaliation claim).

If Wery is claiming Hanel would not give her a grievance form and would not let her see the Captain in retaliation for exercising her right to speech, that claim fails as well.  Hanel told Wery she could get a grievance form from the Captain, and the Captain was already on the way to meet with Wery when Wery told Hanel she wanted to see the Captain.

When an inmate brings a claim alleging retaliatory discipline, the inmate has a heavy burden of proving that the discipline would not have been imposed but for the correctional officer's unconstitutional, retaliatory motive.  See Rouse v. Benson, 193 F.3d 936, 940 (8th Cir. 1999); Goff v. Burton, 7 F.3d 734, 736-38 (8th Cir. 1993).  Wery can not meet this burden in

---

[12]  Wery did not elaborate on what she meant by "all hell broke loose" beyond stating that the other two inmates were "mad as hell."  (Doc. #52-5).

[13]  In response to Wery's grievance it was noted that one of Hanel's duties was to turn the lights on by 9:30 in the morning for safety and security purposes, and Wery was responsible for putting her glasses on prior to that time.  (Doc. #52-5, p. 14).

regard to Hanel taking her recreation time away.  There is a penological interest in maintaining order in the SMU where unruly inmates are temporarily housed for behavioral issues.  As Wery stated, "all hell broke loose that night," and accordingly, it was appropriate for Hanel to keep the inmates from talking and not allow Wery recreation time as she demanded.  Furthermore, it is clear based on Wery's grievance form that she was arguing with Hanel, and likely Theresa Wunderluch, regarding recreation time prior to Hanel allegedly informing her that she would not get any recreation time that day.  Wery does not allege she was denied recreation on any other occasion.  General harassment is not actionable and Wery has not stated a claim of retaliation for her exercise of a constitutional right.  Additionally, Wery can not maintain a claim against other employees for failure to protect her from Hanel's alleged harassment when her allegations against Hanel are simply too broad and conclusory.

## Access to Courts and Legal Mail

Wery alleges that while she was in the SMU in 2009 she was denied access to legal materials to work on her divorce case, a state petition for post conviction relief, and an appeal of the state district court's denial of Wery's state petition for post-conviction relief.  (Doc. #20, pp. 24-25).  Wery states she was represented by counsel in connection with her post-conviction petition and appeal, but she was not satisfied with her attorney.  Id.  Additionally, Wery alleges that while in the SMU defendant Sean Bowen, who was Chief of Security, denied Wery's request for her legal paperwork, but 36 hours later his decision was overturned by defendant Colby Braun, the Operations Administrator.  Id.  Wery states that because she was denied access to legal materials she served an additional sixteen months because she was subjected to double jeopardy.  Id. at 25-27.  Wery also complains of having to handwrite legal documents and of having to use a computer for legal research rather than books.  Id. at 25.

To sustain a claim of denial of access to the courts, it is not sufficient to merely allege a denial of access to legal materials, even if the denial is systemic. Sabers v. Delano, 100 F.3d 82, 84 (8th Cir. 1996). Instead, the prisoner must show the lack of access to materials "hindered [her] efforts to proceed with a legal claim in a criminal appeal, postconviction matter, or civil rights action seeking to vindicate basic constitutional rights." Id. (citing Lewis v. Casey, 518 U.S. 343, 355 (1996)). In other words, the prisoner must plead prejudice or an actual injury. Id.; see also Klinger v. Department of Corrections, 107 F.3d 609, 616-617 (8th Cir. 1997).

Assuming without deciding that Wery has a right to access to the courts in divorce proceedings, Wery has failed to state a claim because she has not pled prejudice or an actual injury related to the civil matter. Similarly, Wery has not pled prejudice or an actual injury related to defendant Sean Bowen temporarily denying Wery access to her legal paperwork, and has thus failed to state a claim with regard to that instance. Additionally, Wery has failed to state a claim with regard to her petition for post-conviction relief and the appeal of the state district court's denial of the petition. Wery was not denied adequate access to the courts because she was represented by counsel. See Entzi v. Redmann, 485 F.3d 998 (8th Cir. 2007) (limitations on plaintiff's access to law library did not deprive him of access to the courts because plaintiff was represented by counsel, and thus received "a reasonable adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.") (quoting Bounds v. Smith, 430 U.S. 817, 825 (1977)).

Wery has not alleged how having to handwrite her legal materials has hampered her in any legal proceedings. Additionally, with regard to Wery's complaint about only having access to legal materials on the computer, the court notes that if Wery could not find the legal materials

she needed on the computer or elsewhere in the library, she could have requested copies of materials from the North Dakota Supreme Court law library. (Doc. #99-3, p. 4).

Wery alleges defendants have requested to read her legal mail, not sent her outgoing legal mail, and have "shredded" her legal mail.[14] (Doc. #20, pp. 24, Doc. #55, p. 3). Specifically, she states defendants requested to read legal mail associated with this case. (Doc. #20, p. 27). However, Wery does not state whether defendants actually read the mail. Also, she refers to her complaint against defendant Sund filed with the North Dakota Board of Nursing. Id. at 28. Wery states that the North Dakota Board of Nursing sent Wery's original documents back to her at the facility, but defendant Marsch shredded the documents. Id. Wery also alleges she sent a packet to the American Civil Liberties Union ("ACLU"), but the ACLU did not receive the packet. Wery said she confronted Colby Braun, Operations Administrator, about the situation, but he denied any knowledge. Id. Wery claims she would hide her documents prepared for the ACLU with other legal paperwork so that it would not be read and would look "as if it were a thin legal letter." Id. at 28-29.

In reviewing Wery's grievances, it appears her allegation that defendants requested to read her legal mail relate to Wery having access to the law library while in the SMU. (Doc. #52-7, p. 1). The facility's policy provides that inmates in the SMU may have access to materials from the law library by request slip, if the inmate can show a filing deadline before release from disciplinary detention, or within fourteen days after release from disciplinary detention. (Doc.

---

[14] In Wery's amended complaint she does not allege defendants actually read her legal mail. However, in her responses to defendants' motions for summary judgment she states defendants "have read legal mail," and "demand production of paperwork to get legal materials." (Doc. #55, p. 3; Doc. #96, p. 8). Wery did not elaborate on the circumstances surrounding these allegations.

#52-7, pp. 1, 3, 5; Doc. #78-30, p. 1; Doc. #78-31, p. 1; Doc. #78-32, p. 1; Doc. #78-34, p. 1; Doc. #99-3, p. 5). Wery filed grievances challenging the requirement that she must show proof of a filing deadline. (Doc. #52-7, pp. 1-2, 4; Doc. #78-30, p. 1; Doc. #78-31, p. 1; Doc. # 78-33, p. 1). Wery's allegation is essentially an access to the courts claim. There is no evidence in the record that Wery provided proof of any filing deadlines to employees at the facility, and Wery has not pled prejudice or actual injury resulted from her lack of access to the law library while in the SMU.

Wery's claim that employees at the facility read and shredded her legal mail appear to relate to Wery's allegation that defendant Marsch shredded documents returned to Wery from the North Dakota Board of Nursing. Wery received a letter from the North Dakota Board of Nursing with copies of the complaint and supporting documentation she had submitted. In a grievance Wery stated the letter she received was opened and the copies of her documents were destroyed. (Doc. #78-22, p. 1). Defendant Marsch, the Medical Director, admitted to destroying the documents, said she meant no ill will, and thereafter obtained additional copies and provided those to Wery. (Doc. #78-22, p. 1; Doc. #78-23, p. 1). Additionally, Marsch indicated that she thought Wery already had copies of the documents, and when she found out Wery did not have copies, she obtained copies for Wery. (Doc. # 78-22, p. 1). Wery states she was never told the documents were destroyed until she questioned Marsch about the documents weeks later. (Doc. #78-23, p. 1). Defendant Heather Luchi, acting as the Grievance Officer, made the following findings and recommendation:

> The mail form the Board of Nursing was accidentally forwarded from the control room, to the Medical Director. It does appear the Medical Director made a poor decision in discarding the paperwork, rather than forwarding the paperwork to you. The Medical Director did meet [with] you and explained what happened and

was able to get copies of your paperwork back to you. It seems there was a process of mistakes and I apologize for that.

(Doc. #78-23, p. 1). On appeal to Leann Bertsch ("Bertsch"), Director of the North Dakota Department of Corrections, Wery stated Marsch read her legal mail and complained that the documents were shredded and Marsch failed to inform Wery that the documents were discarded. (Doc. #78-24, p. 1). In response, Bertsch noted that "correspondence from professional licensing boards will be added to the list of official or legal correspondence," and that "staff did their best to rectify the matter and made an apology for the error." (Doc. #78-29, p. 2). She went on to state that Marsch was no longer employed at the prison and appropriate action was taken.[15] Id.

It is well established that inmates have a right to send and receive mail. Thornburgh v. Abbott, 490 U.S. 401 (1989). The court assumes without deciding that the mail received from the North Dakota Board of Nursing was legal mail and entitled to heightened protection. Marsch opening and discarding Wery's mail was an isolated incident. The Eighth Circuit has held that an "isolated incident, without any evidence of improper motive or resulting interference with [the inmate's] right to counsel or to access to the courts, does not give rise to a constitutional violation." Gardner v. Howard, 109 F.3d 427, 431 (8th Cir. 1997). While discarding Wery's mail was an arbitrary and improper act, Wery's allegation of only one incident of such behavior fails to state a claim of constitutional dimension. Davis v. Goord, 320 F.3d 346, 351 (2nd Cir. 2003) ("an isolated incident of mail tampering is usually insufficient to establish a constitutional violation"); Rowe v. Shake 196 F.3d 778, 782 (7th Cir. 1999) (allegations that prison officials "repeatedly and intentionally withheld" a prisoner's mail may state a First Amendment claim, but an "isolated" incident will not).

_____

[15] No reason was provided as to why Marsch was no longer employed by the institution.

Wery has not established that Marsch acted with an improper motive or that her right to access to the courts was violated by Marsch opening and discarding the mail. Marsch told Wery she meant no ill will and replaced the documents. The incident had no effect on Wery's complaint against Sund filed with the North Dakota Board of Nursing, and the facility took steps to ensure that mail from professional licensing boards would be deemed as legal mail in the future. Wery has not raised a genuine issue of material fact and cannot prevail on this claim as a matter of law.

Finally, with regard to Wery's allegation that she sent a packet to the ACLU that was not received, Wery has failed to state a claim. Wery mentioned in letters to Bertsch that her mail had not reached its destination, but she was not specific as to what mail she was referring, and she never alleged any personal involvement by any of the facility's employees in preventing the mail from reaching its destination. (Doc. #78-25, p. 2; Doc. # 78-26, p. 4 ). Wery states she asked Colby Braun why the ACLU had not received her packet, but he had no knowledge of the situation. (Doc. #20, p. 28). The isolated incident of Wery's mail not reaching its destination does not amount to a constitutional violation.

## HIPPA AND PRIVACY

In Wery's supplement to her amended complaint she alleges her medical information was discussed loudly, patient information is listed on a board in the back office, and medical charts and papers are left out in violation of HIPPA. (Doc. #75, p. 1). Wery also alleges that a guard accompanying an inmate to see the nurse is a violation of HIPPA.[16] Id. at 2. HIPPA does not

---

[16] In two letters Wery wrote to Bertsch she stated HIPPA was violated because Hauschild was allowed to be present at Wery's medical appointment when she was assessed by nursing staff. (Doc. #52-3, pp. 5, 30; Doc. #78-3, p. 4; Doc. #78-25, p. 2).

provide for a private cause of action for its violation.  <u>Dodd v. Jones</u>, 623 F.3d 563, 569 (8th Cir. 2010); <u>Adams v. Eureka Fire Prot. Dist.</u>, Case No. 09-1315, 2009 WL 3352032 (8th Cir. Oct. 20, 2009) (unpublished opinion).  Therefore, Wery's HIPPA claims must be dismissed.

To the extent Wery alleges her medical information was compromised in violation of her right to privacy, she has failed to state a claim upon which relief can be granted.  "[A] prison inmate has a far lower expectation of privacy than do most other individuals in society." <u>Goff v. Nix</u>, 803 F.2d 358, 365 (8th Cir.1986).  "Prisoners cannot enjoy greater privacy protection than individuals in free society, and some amount of sharing of medical information in areas where it might be overheard by other patients - e.g., in hospital emergency rooms, school infirmaries, and the waiting room of a doctor's office - is commonplace."  <u>Smith v. Nebraska State Penitentiary</u>, No. 4:09CV3257, 2010 WL 829010, at *3 (D. Neb. Mar. 2, 2010) (quoting <u>Franklin v. McCaughtry</u>, 110 Fed. Appx, 715, 719 (7th Cir.2004) (citations omitted)).  While Wery states others were around when she heard her medical information being discussed, presumably while Wery was with nursing staff, she does not state that others actually heard the information, and even if others did hear the information, it would not amount to a constitutional violation.  Also, Wery does not allege her personal medical information was ever posted on the board in the back office, or that her medical chart was ever left out.

It is well-established that an inmate's constitutional rights may be curtailed by a policy or regulation that is shown to be "reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987).  A nurse requested that Hauschild be present at Wery's nursing assessment.  (Doc. #52-3, pp. 9-10; Doc. #78-4, pp. 6-7).  During that appointment Wery became disorderly.  <u>Id.</u>  Having a guard present at a nursing assessment to ensure the safety of medical

personnel is related to a legitimate penological purpose. Wery's allegation does not arise to the level of a constitutional violation.

## CONCLUSION

After construing Wery's amended complaint and supplement to the amended complaint liberally, and viewing the facts in the light most favorable to her, the court finds defendants are entitled to judgment as a matter of law on all of Wery's claims. It is **RECOMMENDED** that the County Defendants' motion for summary judgment (Doc. #50) be **GRANTED**, the State Defendants' motion for summary judgment (Doc. #77) be **GRANTED**, the County Defendants' motion to dismiss (Doc. #50) be found as **MOOT**, and Wery's amended complaint (Doc. #20) be **DISMISSED** with prejudice. It is also **RECOMMENDED** that the court find any appeal would be frivolous, could not be taken in good faith, and may not be taken *in forma pauperis*.

Dated this 28th day of August, 2012

 /s/ *Karen K. Klein*
Karen K. Klein
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT

Pursuant to Rule 72(b), Federal Rules of Civil Procedure, and District of North Dakota Local Court Civil Rule 72.1(D)(3), any party may object to this Report and Recommendation by filing with the Clerk of Court no later than **September 10, 2012**, a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.